FILED

2021 Jan-27  PM 04:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA

UNITED STATES OF AMERICA EX
REL. BILLY JOE HUNT

      Plaintiff,

    vs.

COCHISE CONSULTANCY, INC, d/b/a
COCHISE SECURITY, and THE
PARSONS CORPORATION d/b/a
PARSONS INFRASTRUCTURE &
TECHNOLOGY,

      Defendants.

Case No. 5:13-CV-02168-LCB

## FIRST AMENDED COMPLAINT

COMES NOW Billy Hunt, qui tam Relator and Plaintiff, by and through his undersigned counsel, before this Honorable Court on behalf of himself and the United States of America, its departments and agencies, and bring this action against Defendants The Parsons Corporation d/b/a Parsons Infrastructure and Technology and Cochise Consultancy, Inc., d/b/a Cochise Security and files this First Amended Complaint for money damages and civil penalties arising out of Defendants' violations of the False Claims Act, 31 U.S.C. § 3729, which violations are described hereinafter with particularity.

## INTRODUCTION

This lawsuit alleges that the Defendants have defrauded the United States Department of Defense in connection with the provision of security services

1

provided by The Parsons Corporation ("Parsons") and Cochise Consultancy Inc. d/b/a Cochise Security ("Cochise") as part of Prime Contract No. W912DY-04-D-0005, Parsons' Subcontract No. 800618-60006 and Parsons' Task Order 74475730003. As set forth below, Parsons and Cochise were in violation of the fundamental terms of the contracts and federal regulations pertaining to government acquisition of goods and services. Parsons and Cochise (collectively, "Defendants"), and/or their agents, employees and co-conspirators, knowingly submitted, caused and conspired to submit false claims for payment for the services rendered under the contracts, and in violation of the Federal Civil False Claims Act, 31, U.S.C. § 3729, *et seq.* Relator brings this civil action on behalf of and in the name of the United States of America to recover damages and civil penalties under the FCA, and alleges:

1.     The FCA prohibits knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(l)(A). Additionally, the FCA prohibits knowingly making, using, or causing to be made or used, a false or fraudulent record or statement (a) to get a false or fraudulent claim paid or approved by the federal government (or a government contractor, if the money to pay the claim comes from the government) or (b) to conceal, avoid, or decrease an obligation to pay or transmit money or property to the federal government. 31 U.S.C. §§

3729(a)(l)(A),  3729(a)(l)(G),  3729(b)(2)(A)(ii).  Courts  have  interpreted  these provisions  to  impose  liability  and  penalties  upon  all  claims  made  under fraudulently induced contracts.  Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(l).

2.     Defendants' scheme involved an undisclosed improper conflict of  interest  arising  from  the  close  personal  relationship  between  Cochise President James Johnson and the primary Contracting Officer in Iraq for the Army Corps of Engineers, Wayne Shaw ("Shaw"). This relationship allowed Cochise  to  influence  government  employees  and  agents  in  a  successful scheme  to  win  lucrative  government  subcontracts  or  to  obtain  favorable specifications in government subcontracts, and to exclude competitors from eligibility and/or the ability to compete for subcontracts or specifications, and  otherwise  entered  into  anti-competitive  agreements.  These  practices subverted regulations governing the competitive bid process for government subcontracts  and  violated  laws,  regulations,  and  contract  provisions prohibiting conflicts of interest and the provision of gratuities to government officials to obtain favorable treatment.

3.     Under a guise of unusual and compelling urgency, and in a time of war, Defendants enacted a concerted and coordinated effort to ensure that

3

Cochise was awarded security subcontracts from Parsons despite the fact that (i) the statutory requirements for an unusual and compelling urgency were not met and (ii) Cochise's ability to perform the services and provide the materials required by the contracts was much more limited and expensive than any other known provider.

4.      In return for the favorable treatment, Cochise plied Wayne Shaw ("Shaw") with unlawful gifts and gratuities, including trips to Kuwait where he received additional gifts and gratuities for securing Cochise lucrative contracts with the Army Corp of Engineers.

5.      Despite Wayne Shaw's duty to prevent even the appearance of a conflict of interest with contractors and subcontractors, Shaw reciprocated and encouraged  the  improper relationship with Cochise by giving Jesse Johnson and Cochise special treatment during their time in Iraq, including housing within the Corps of Engineers compound and the benefits contained therein, as well as unfettered and improper access to potential contract clients and exerting his influence on Contractors, including Parsons, to subcontract with Cochise.

6.      Shaw's and Defendants' actions eliminated Cochise's competition and ensured that Cochise's services would be acquired, no matter how much they cost. As a result, Cochise sought and obtained higher prices for their

4

services than the government would have paid if bidding were truly competitive, as required by federal laws.

7.    Defendants' conduct violates the FCA in at least three ways. First, Defendants fraudulently induced the government to enter into subcontracts for the purchase of Cochise's services by (a) providing illegal gratuities and gifts to Shaw and his team to obtain favorable treatment; (b) conspiring with each other and with Shaw to rig the evaluation process of subcontracts to ensure the use of Cochise's services or to ensure the selection of Cochise as a prime subcontractor; and (c) otherwise subverting competition for the subcontracts at issue and failing to engage in competitive bidding, including by entering into anti-competitive agreements. Because the contracts and purchases at issue were fraudulently induced, every claim for payment under the contracts at issue is a false claim subject to liability and penalties.

8.    Second, because Defendants had an affirmative legal obligation to engage in full and open competition, and the failure to engage in competitive bidding under false pretenses resulted in express and/or implied false certifications being made to the government by Parsons and Cochise.

9.    Third, because Defendant Parsons knowingly billed the Department of Defense and received payment from the Government for services procured and performed in violation of the Anti-Kickback Act of 1986, 41 U.S.C. § 51-58, (and the antikickback/anti-bribery/anti-gratuity regulations of the FAR) and

5

because it knowingly violated federal legal, regulatory and contractual obligations to engage in full and open competition and/or competitive bidding, Parsons had an obligation to pay back to the Government money and/or funds it received as payment for illegally obtained services performed by Cochise. Parsons concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the Government.  The failure to transmit said money or property to the Government was a continuing violation.

10.     Defendants' scheme was extremely brazen. Cochise was able to secure lucrative government subcontracts despite its inability to meet contract specifications and perform the contracts as well as, or for less or even equal expense, to its competitors. Defendants successfully conspired to award Cochise the subcontract despite the fact some Parsons Senior Contract Administrators refused to award Cochise the subcontract due to obvious conflicts of interest, and had, in fact, already selected a competitor of Cochise to receive the contract before being ultimately overruled by their superiors at Parson and the Army Corp of Engineers.

## JURISDICTION  AND  VENUE

11.     This is a civil action by Plaintiff/Relator Billy Joe Hunt (hereinafter "Relator"), acting on behalf and in name of the United States, against all Defendants under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court

has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

12.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), because that section authorizes nationwide service of process, and because each of the Defendants has minimum contacts with the United States. Each of the Defendants can be found in, resides in, or have transacted business in the Northern District of Alabama.

13.     Venue is proper in this judicial district pursuant to 31 U.S.C. 3730(a) because each of the Defendants can be found in, resides in, or has transacted business in the Northern District of Alabama, and many of the alleged acts occurred in this judicial district. Defendants conduct business in this judicial district. Department of Defense contracts with private security firms are approved, executed and funded through governmental offices in this judicial district. Additionally, acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district. Parsons contracts with the Department of Defense were administered through the Army Corp of Engineers, whose primary acquisition offices are located in this judicial district, and the Defendants addressed false statements within the meaning of 31 U.S.C. § 3729 to the Department of Defense Army Corps of Engineers and in this judicial district.

14.     The action is premised upon Defendants' scheme to defraud the United States by improperly submitting bids for subcontracts and then awarding

subcontracts for security services in Iraq, thereby resulting in enormous overpayment by the United States for private military security services.

15.   None of the allegations set forth in this Complaint are based on any public disclosure of information or transactions in a civil, criminal, or administrative hearing, in a congressional, administrative, or General Accounting Office Report, hearing, audit, or investigation, or from the news media.

16.   Relator is an Original Source with direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B), derived from his employment with Parsons, of the information on which the allegations set forth in this Complaint are based, and he has voluntarily provided the information to the Government prior to the filing of this Complaint.

## PARTIES AND OTHER RELATED PERSONS

17.   Plaintiff/Relator is a resident of the state of Alabama and resides at 125 Royal Drive, Apartment 605, Madison, AL 35758. Relator is a U.S. Citizen.

18.   Relator was first hired by Kellogg, Brown and Root (" KBR") as a Labor Foreman for the Log Cap contract and arrived in Iraq on July 28, 2003.  In July 2004, Relator was offered a job at Parsons and began employment as a Site Engineer.   As a Site Engineer, Relator was responsible for building a new camp and coordinating construction with subcontractors at Camp Ashraf. In January 2005, Relator was promoted to Camp Ashraf Site Manager and was responsible for overseeing the

8

completion of site construction.

19.   In September of 2005, Relator applied for and received a promotion to the position Northern Operations Deputy Program Manager ("DPM, Northern Ops") for Parsons entire Coalition Munitions Clearance Program ("CMC"). As DPM, Relator was responsible for managing the day-to-day operations of the CMC including overseeing the scope of development, management and performance of the projects and ensuring that projects met their specified goals and objectives. The DPM is responsible for managing operations and personnel, along with the Project Manager ("PM"). During the time period of the false claims alleged herein, Relator worked as the Northern Operations DPM out of Parsons' Baghdad headquarters in Camp Victory, Iraq.

20.   From November 30, 2010 to June 3, 2012, Relator voluntarily cooperated with the Federal Bureau of Investigations ("FBI"), the Internal Revenue Service's Criminal Investigation Service, the Defense Criminal Investigative Service ("DCIS"), the Special Investigator General for the Reconstruction of Iraq, and the Department of Justice for the purpose of assisting in an investigation of contract fraud occurring in Iraq. During this period, Relator admitted to participating in a kickback scheme related to his employment as a Deputy Project Manager for The Parsons Corporation. On October 10, 2012, Relator pled guilty to one count of Filing a False Tax Return and one count of Conspiracy to Commit Wire Fraud, Mail Fraud, and to Engage

in Unlawful Kickbacks. For these crimes, Relator served 10 months and is presently in the process of paying restitution.

21.     Now released, it is Relator's goal to ensure that the rampant war-time contract fraud of which he has personal and independent knowledge is fully exposed and addressed. To date, the Government has not prosecuted, criminally or civilly, all of the fraud that Relator exposed, and therefore, Relator brings this action under the federal False Claims Act based upon the information and documents he provided throughout his cooperation and unrelated to Relator's past conduct and crimes to which he pleaded guilty and was punished.

22.     Defendant, The Parsons Corporation, provides engineering, construction, technical and management services, and performs services under contract with the United States Government in Iraq and Afghanistan. Parsons has 13,000 employees in all 50 states and in 25 locations worldwide. Parsons maintains offices in over 30 states and is headquartered in California at 100 W. Walnut St., Pasadena, CA, 91124. Parsons Corporation also maintains an office within the Northern District of Alabama at 401 Diamond Dr., Huntsville, AL  35806. Parsons' revenues in 2012 were $3 Billion.

23.     Defendant Cochise Consultancy, Inc., contracts with the Government to provide security services. Cochise is headquartered and maintains an office at 5202 Silverado Valrico, Florida, 33594. Cochise was founded in 1996 by Colonel Jesse L. Johnson (ret.)  ("Johnson"). Cochise was awarded Subcontract Number

800618-60006, task order number 744757-30003 on or about February 20, 2006 (referred to as the "Cochise subcontract").

24.    United States Army Corp. of Engineers ("USACE" or "COE"), is part of the United States Department of Defense. As an agency of the United States, the COE is responsible for entering into and administering contracts for services and material procurement related to the operations of the United States Armed Forces, including the building and maintenance of U.S. military bases and infrastructure in Iraq since the beginning of Operation Iraqi Freedom in March of 2003.

25.    Wayne Shaw was the Project Manager for the COE and was the government official with whom Cochise founder Jesse Johnson had close personal ties. Mr. Shaw specifically instructed Parsons Personnel, including Relator, to award the security subcontract to Cochise despite the obvious issues with the bid.

26.    Steve Hamilton was the COE Contract Officer ("KO") for the Parsons Prime Contract. A KO is responsible for entering into, administering, or terminating contracts on behalf of the United States Government. Prior to the receipt of the security subcontract by Cochise, Mr. Hamilton, at the direction of Wayne Shaw, issued a directive to Parsons Corporation to award the security subcontract to Cochise.

11

27.     Hoyt Runnels was the Procurement Manager for Parsons and participated in the subcontract Selection Committee that originally selected ArmorGroup as the recipient for the security subcontract. Mr. Runnels refused to sign the subcontract naming Cochise because of the patent defects in the Cochise bid, even after threats to his employment were made by the COE, specifically Wayne Shaw.

28.     ArmorGroup is a British company providing private protective security services, risk management consultancy, security training and mine action services. It has 38 offices I 27 countries, including Afghanistan, Bahrain, Colombia, Iraq, Lebanon, Nigeria and Sudan.

29.     Dwight Hill was a Senior Subcontract Administrator for Parsons. He replaced Hoyt Runnels in the contract negotiations after Mr. Runnels refused to sign the contract. Dwight Hill executed the contract naming Cochise as the supplier of the security services on February 21,2006.

30.     Adrian Quick was a Contract Specialist employed by Parsons and helped write the bid proposals for the security subcontract. Mr. Quick was also employed as Mr. Runnel's assistant in Iraq.

31.     Michael Goodman was a Contract Specialist employed by Parsons and who helped write the bid proposals for the security subcontract with Adrian Quick.

12

32.    Joe Bell was the Convoy Operations Manager for Parsons in Iraq. He was in charge of security for the entire CMC project. Mr. Bell worked with Adrian Quick to draft the bid proposals for the security subcontract. Mr. Bell was also the head of the Selection Committee that received and reviewed the bids and originally selected the ArmorGroup as the prime security subcontractor.

33.    Gaines Newell was the Program Manager for Parsons' Coalition Munitions Clearance project. Mr. Newell also refused to sign the contract naming Cochise as the security subcontractor due to the fact that there were better bids submitted.

34.    Karsten Rothenberg was a junior Vice President of Parsons who authorized the purchase of additional materials that was required due to Cochise's inability to supply the necessary equipment to perform on the subcontract.

35.    Earnest O. Robbins III was the Senior Vice President of Parsons who authorized the purchase of additional materials that was required due to Cochise's inability to supply the necessary equipment to perform on the subcontract.

36.    Robert Riendeau was a Parsons employee whose job was to coordinate the arrangements for individuals coming to and from Iraq through Kuwait. This included coordinating all transportation requirements for CMC personnel and work in conjunction with the other "meet and greet" subcontractors to assist personnel in their arrivals and departures.

37.    Steven Michael Scales is Jesse Johnson's son-in-law. At one time he

13

was employed by Palomino Security Consultancy, Inc. in Valrico, Florida. In September 2006, in Kuwait City, Mr. Scales was observed giving improper gifts and gratuities to Wayne Shaw after the award of the Cochise subcontract.

## STATUTORY AND REGULATORY BACKGROUND

38.    To ensure the integrity of its acquisition and contracting processes, the United States enacted certain provisions of the Federal Acquisition Regulation (the "FAR"), codified in Title 48 of the Code of Federal Regulations.

39.    These codified standards are based upon a rich history of legislative intent and regulatory emphasis designed to ensure the open and unadulterated acquisition of goods and services by the United States Government and safeguarding the Treasury, and ultimately the taxpayers, from the harm effectuated by fraudulent procurement.[1]

---

[1] *See NetStar-1 Gov't Consulting, Inc. v. United States,* 101 Fed. Cl. 511, 527 (Fed. Cl. 2011) aff 'd, 473 F. App'x 902 (Fed. Cir. 2012) at Footnote 22: " Detailed regulatory guidance and restrictions regarding OCIs have existed since 1963. *See* DOD Directive 5500 .10 (effective June 1, 1963), 32 C.F.R. § 141.2(b) (1966). These initial rules focused only on research and development contracts, but nonetheless emphasized that their primary objective was to prevent government contractors from obtaining "unfair competitive advantage." 32 C.F.R. § 1.141.2(a); *see also* James W. Taylor, Organizational Conflicts of Interest in Department of Defense Contracting, 14 Pub. Cont. L.J. 158, 159 (1983) (discussing the history of OCIs in defense acquisitions) . FAR subpart 9.5, portions of which were first adopted in 1983, see Fed.Reg. 42142 (1983), was designed to preserve the existing DOD policy, albeit while expanding its coverage beyond the realm of research and development contracts. *See* Taylor and Dickson, supra, at 111. See also, House Comm. on Gov't Operations, Avoiding Conflicts of Interest in Defense Contracting and Employment, H.R. Rep. No. 917 (1963); House Comm. on Gov't Operations, Air Force Ballistic Management (Formation of Aero Space Corporation), H.R. Rep. No. 324 (1961); House Comm. on Gov 't Operations, Organization and Management of Missile Programs, H.R. Rep. No. 1121 (1959); The 1963 report expressed concern regarding the

40.     The Government and the Department of Defense ("DOD") require that the contractors with whom it does business, including but not limited to the Defendants, follow and comply with the FAR.   For example, the Government and the DOD require contractors to engage in full and open competition vis-à-vis competitive bidding.

41.     Further, the Government and the DOD require contractors to "conduct themselves with the highest degree of integrity and honesty." 48 C.F.R. § 3.1002. One explicit - and obvious - component of that requirement is that government contractors must not provide bribes or illegal gratuities to government officials in order to secure favorable treatment.

42.     It is a crime for any person to give, or to promise to give, "anything of value to any public official" - including "an officer or employee or person acting for or on behalf of the United States, or any department, agency, or branch of Government thereof' - with " intent ... to influence any official act ..."  or "because of any official act performed or to be performed"  by the public official. 18 U.S.C. § 201. The FAR incorporates this prohibition into all government contracts worth more than $5 million and with a duration of longer than 120 days in at least three ways.

---

appearance of organizational conflicts, noting that such appearances having "the same detrimental effects" as actual conflicts . Similar concerns were expressed by Congress in adopting the authorization act that led to the most recent amendment of the FAR's OCI regulations. See The Duncan Hunter National Defense Authorization Act for Fiscal Year 2009, Pub.L. 110-417, § 841 (codified at 41 U.S.C. § 405()).

43. First, each such contract must contain a clause providing that:

The Contractor shall timely disclose, in writing, to the agency Office of the Inspector General, with a copy to the Contracting Officer, whenever, in connection with the award, performance, or closeout of this contract or any subcontract thereunder, the Contractor has credible evidence that a principal, employee, agent, or subcontractor of the Contractor has committed - (A) a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (B) A violation of the civil False Claims Act ....

48 C.F.R. § 3.1003(a); 48 C.F.R. § 52.203-13(b)(3)(i). The contractor also must "include the substance of this clause ... in subcontracts that have a value in excess of \$5,000,000 and a performance period of more than 120 days." 48 C.F.R. § 3.1003(a); 48 C.F.R. § 52.203-13(d).

44. Second, each such contract must contain a clause permitting the Government to terminate the contract if the contractor "(1) Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and (2) Intended, by the gratuity, to obtain a contract or favorable treatment under a contract." 48 C.F.R. § 3.202, 48 C.F.R. § 52.203-3. This provision has been required in government contracts above the \$5,000,000/120-day threshold since 1996.

45. Third, the FAR provides that, irrespective of the inclusion in the applicable contract of the clause described in paragraph 36, the Government may suspend or disbar a contractor for the "knowing failure by a principal to timely

disclose to the Government ...  credible evidence of a violation of Federal criminal law involving fraud, *conflict of interest,* bribery, or *gratuity violations* found in Title 18 of the United States code or a violation of the civil False Claims Act." 48 C.F.R. § 52.203-13.

46.    Laws and clauses required to be included in Government contracts also prohibit the payment of money or gratuities to prime contractors for the purpose of obtaining or rewarding favorable treatment in connection with a government prime contract.  41 U.S.C. § 51- 58; 41 U.S.C. § 52-53; 48 C.F.R. §§ 3.502-3, 52.203-7.

47.    The Anti-Kickback Act of 1986, 41 U.S.C. § 51-58, prohibits any person receiving funds from the U.S. Government from (1) providing or attempting to provide or offering to provide any kickback; (2) soliciting, accepting or attempting to accept any kickback; or (3) including, directly or indirectly, the amount of any kickback in the contract price. See 41 U.S.C. § 51-58; 41 U.S.C. § 52-53.  The express prohibition of the Anti-Kickback Act of 1986 is incorporated into the contracts between the Government and the Defendants. See 48 C.F.R. §§ 3.502-3, 52.203-7.

48.    Together, these provisions render compliance with federal anti-kickback, anti-bribery and anti-gratuity laws an explicit condition of participation in government contracts. Moreover, contractors have a continuing affirmative

obligation, founded in both regulatory and contract provisions, to "timely disclose" all "credible evidence" of the payment of illegal gratuities. The failure to make disclosure of "credible evidence" of the payment of illegal gratuities constitutes a continuing false statement that the contractor has no knowledge of the payment of such gratuities to government officials. Defendants knowingly failed to make such disclosures to obtain the contracts at issue initially and later to induce the government to pay    claims.

49.     In addition, the government's policy is "that contracting officers shall promote and provide for full and open competition in soliciting offers and awarding Government contractors." 48 C.F.R. §6.101. The FCA imposes liability and penalties on all claims submitted under government contracts that were fraudulently induced, including by payment of illegal gratuities or schemes to subvert competition in contract bidding.

50.     The requirement to promote and provide full and open competition is also applicable to general contractors acting on an agency's behalf to acquire subcontractor services for a Government contract. See 41 U.S.C.A. §3301 and 48 C.F.R. §6.101.

51.     Title 41 U.S.C.A. §3301 states:

(a) In general.--Except as provided in sections 3303, 3304(a) [noncompetitive procedures], and 3305 of this title and except in the case of procurement procedures otherwise expressly authorized by statute, an

18

executive agency in conducting a procurement for property or services shall (1) obtain full and open competition through the use of competitive procedures in accordance with the requirements of this division and the Federal Acquisition Regulation; and (2) use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement. (b) Appropriate competitive procedures. (1) Use of sealed bids.--In determining the competitive procedures appropriate under the circumstance, an executive agency shall (A) solicit sealed bids if (i) time permits the solicitation, submission, and evaluation of sealed bids; (ii) the award will be made on the basis of price and other price- related factors; (iii) it is not necessary to conduct discussions with the responding sources about their bids; and (iv) there is a reasonable expectation of receiving more than one sealed bid; or (B) request competitive proposals if sealed bids are not appropriate under subparagraph (A). (2) Sealed bid not required.--Paragraph (1)(A) does not require the use of sealed-bid procedures in cases in which section 204(e) of title 23 applies. (c) Efficient fulfillment of Government requirements.--The Federal Acquisition Regulation shall ensure that the requirement to obtain full and open competition is implemented in a manner that is consistent with the need to efficiently fulfill the Federal Government's requirements.

52.     Government contracting officers are further required to analyze acquisitions in order to identify and evaluate potential organizational conflicts of interest as early in the procurement process as possible and to avoid or mitigate significant potential conflicts of interest before contract award. Contracting officers must formally document their decisions regarding and determinations of potential organization conflicts of interest when a substantive conflict exists.  If a conflict exists, and the contracting officer finds that it is in the best interest of the United States to award the contract notwithstanding the conflict, a waiver shall be submitted and included in the contract file. 48 C.F.R. §9.504. The foregoing legal

requirements render compliance with full and open competition an explicit condition of participation in government contracts.

## FACTUAL ALLEGATIONS

### a.   The Parsons Prime Contract for Coalition Munitions Clearance

53.   On September 30, 2004, the Department of Defense by and through the Department of the Army awarded Parsons' subsidiary, Parsons Infrastructure and Technology, Inc., a services contract for the clean-up of excess munitions left by retreating or defeated enemy forces and discovered by Coalition troops. The contract was identified by IDV Procurement Instrument Identification No. W912DY040005 and pertained to "Engineering Services" described by Principal NAICS Code 541330.

54.   This initial contract was valued at $60,000,000 with a scheduled completion date of June 6, 2005. This was the largest contract for Parsons with the Department of Defense in 2004.

55.   The contract was awarded using Parsons' Vendor DUN No. 006908511 and Global DUNS Number 030866545.

56.   This contract and the work it called for became widely known as the Parsons Coalition Munitions Clearance Project ("CMC").

57.   Part and Parcel to effectuating aims and goals of the CMC, Parsons was

required and authorized to subcontract facets of the CMC project to other companies who specialized in particular areas requisite to the handling, disposal, and tracking of munitions.

58.     One facet of the CMC project was to provide adequate security to the employees of Parson, their subcontractors, Iraqi nationals, and others who worked on the CMC project.

59.     The Parsons Prime Contract and the process of subcontracting companies to assist on performing CMC, including subcontracts for security services, was governed by the basic set of federal regulations relating to federal procurement are contained in the Federal Acquisitions Regulation ("FAR"). 48 C.F.R. 1, *et seq.*

60.     From January 6, 2006, to February 21, 2006, Parsons CMC Procurement Department received 231 requisitions for materials and processed 83.69% of them within that period. Parson also issued 191 subcontracts as part of the CMC during that period and had assigned 68.58% of them to subcontractors at that time.

61.     One of these subcontracts was Subcontract No. 800618-60006 and Parsons' Task Order 74475730003, the "Cochise Subcontract."

**b.     The Cochise Subcontract for Security Services**

62.     On February 4, 2006, Parsons solicited bids by way for issuing a Request for Quote ("RFQ") for services described   as:

"... security personnel to provide security support for various logistical convoys required to support the CMC mission. In addition to the regular logistics convoys, the security contractor will be responsible for Personnel Security Detail (PSD) support for Parsons and their client, the US Army Corps of Engineers, and for the movement of Class V materials as part of the CMC mission inside of Iraq."

63.   The RFQ included the specification that Bidders account for the provision of <u>all </u>materials to supply mobile armored vehicle logistical support convoy teams and their services known as "mobile team support activities."

64.   In response, Parsons received at least four different bids from foreign and American companies in Iraq providing security services, including, ArmorGroup, Aegis, Sabre, and others.

65.   Initially, Cochise did not receive an RFQ because it was determined by the Parsons' Evaluation Group that Cochise did not have the necessary qualification (i.e., proof of insurance) necessary to supply the services being solicited in the RFQ.

66.   On or about February 6, 2006, Cochise learned of the RFQ and complained to Wayne Shaw and Parsons that it (Cochise) should be allowed to submit a bid for the aforementioned RFQ.

67.   On February 16, 2006, Senior Subcontract Administrator D.E. "Dwight" Hill for Parsons issued a Limited Notice-to-Proceed for Logistical Convoy Security under Parsons BOA 800619-60006 to Cochise.

68.     On February 21, 2006, as part of the CMC project, Parsons subcontracted with Cochise to provide the security services. Prior to this award, the subcontract award process was fraught with infighting and strife between the COE, Parsons, and Cochise  personnel.

69.     It was known by the Parsons PM, DPM, and Contract Administration personnel that, on February 6, 2006, Cochise was outwardly upset that it had not received an RFQ to submit a bid, but Cochise had not been given an RFQ because it had not submitted proper proof of insurance, and clearly Cochise was aware that the subcontract required a bidding process.

70.     Upon information and belief, during the 10-day period to submit a proposal in response to the RFQ, Wayne Shaw verbally expressed his desire that Cochise be awarded the subcontract despite the fact that they did not receive an RFQ.

71.     On February 13, 2006, Hoyt Runnels and Gaines Newell discussed the fact that if the COE wanted the bid to be directed to a particular subcontractor, they would need to receive a directive from the COE but had not yet received any such directive.

72.     Never before had Parson received a directive from the COE on the CMC project.

73.     On February 14, 2006, Parsons' Evaluation Group, a committee to review subcontract bids which included Hoyt Runnels, Mike Goodman, Joe Bell

and Adrian Quick, reviewed at least three bids that were submitted to Parsons for the security services subcontract. These bids were submitted blindly, meaning that each company was unknown to the Evaluation Group and only labeled as "Company A", "Company B" and "Company C." Based on the bids submitted, the Evaluation Group, by majority vote, selected a subcontractor based on: its track record of providing convoy support, their quality of work transporting personnel with lower fatalities, their experience in Iraq, and the fact that the company's bid included 25 or more personnel on the ground, their own vehicle support and their own life support (living quarters, camp services, medical, and food). After selecting the award recipient, the Evaluation Committee learned the recipient of the award was ArmorGroup.

74.    Later that day, February 14, 2006, COE Program Manager, Wayne Shaw, learned of the Evaluation Group's decision. Shaw was a close personal friend to Colonel Jesse L. Johnson (ret.), President of Cochise, who was staying in Iraq at the time. Despite the policy that the COE's compound was off limits to subcontractors, because of Shaw and Johnson's close friendship, Relator observed that whenever Johnson visited Camp Victory, he would eat, sleep, shower, and spend significant time at the COE's office/compound. Johnson frequently enjoyed the benefits afforded to COE personnel therein. Relator knew of no other subcontractor who was allowed to stay at the COE's compound other than Johnson.

75.     In fact, Parsons had strict rules that prohibited subcontractors from interacting with their "client," the Army Corp of Engineers.

76.     On February 14, 2006, Relator was called into Shaw's office and was told by Shaw that no matter what decision had already been made by the Evaluation Group, the subcontract was to be awarded to Cochise.

77.     Indeed, on or about February 14, 2006, Parsons and Wayne Shaw forced the Parsons' Evaluation Group for the purpose of considering a bid from Cochise. Ironically, however, Cochise's bid proved to be higher and less competitive than bids submitted to Parsons by other potential subcontractors.

78.     Never before had Wayne Shaw overruled the Evaluation Committee.

79.     Relator emailed Hoyt Runnels requesting a directive awarding the subcontract to Cochise, however, Runnels stated that any such directive would have to come directly from COE, not procurement, because it would constitute a conflict of interest.  Then, Relator observed Shaw create and deliver a forged directive to Steve Hamilton, the COE contracting officer for Parsons on the Prime Contract, rescinding the award of the subcontract to ArmorGroup.

80.     Mr. Hamilton is legally blind and trusted Shaw with what he was signing because he had worked with Shaw and had relied on Shaw to assist him in his duties at COE and to drive him around Camp Victory. After the directive was signed by Hamilton, Shaw submitted the award for the security services to Cochise to Runnels, however, Runnels refused to execute the directive. Shaw

issued threats to Runnels, but Runnels would not budge in his position because he was part of the Evaluation Group who had made the initial award and knew the award to Cochise was false and in violation of government regulations.

81.    Parsons employees, including Relator, had witnessed Wayne Shaw terminate others' employment in Iraq on previous occasions, and his threats to Runnels were considered serious.

82.    Karsten Rothenberg was a junior Vice President of Parsons and he also received a copy of Shaw's forged directive and eventually authorized the additional expense for the vehicle that Cochise could never provide.

83.    Relator personally observed all of the forgoing events on February 14, 2006, and his co-workers at Parsons came to nickname this day as the "Valentine's Day Massacre."

84.    Following these events, on February 16, 2006, Adrian Quick sent an email to Dwight Hill requesting he obtain additional information from Sabre and ArmorGroup. Hill responded to Quick questioning him whether he was acting on the direction of Gaines Newell or Hoyt Runnels, because he understood the contract was to be awarded to Cochise based on the circumstances surrounding the award. Quick responded to Hill that Cochise could not provide vehicles and could only provide personnel and that he anticipated the COE would rescind the award to Cochise. Gaines Newell brought the forged directive to Hamilton's

attention and Hamilton immediately rescinded the directive to award the subcontract to Cochise.

85. The armored vehicles were considered a critical element of the contract specifications because they were constantly being destroyed by roadside bombs and gunfire. The provision of security vehicles was an expensive endeavor for any security company operating in Iraq at this time.

86. Despite this, on February 21, 2006, Dwight Hill sent an email containing a Limited Notice to Proceed and explaining that a Task Order or an extension of the LMNP would be forthcoming for the award of the subcontract to Cochise. Attached to the email was an interoffice correspondence to the file prepared that same day by Hill that stated, "the subject award is being made in accordance with FAR 6.302-2(b) - Unusual and compelling urgency." Hill's interoffice correspondence explains that there was an "urgent and immediate need" for convoy services and falsely stated that Cochise had "on the job" familiarity with the mission that other security providers did not have.

87. Hill used this supposed "urgency" and false lack of other providers with necessary capabilities to make a "sole source award" even though there were other bidders with similar or superior capabilities to Cochise. F u r t h e r , other bidders (specifically, ArmorGroup) were more capable of providing the

requested services in a quicker, timelier manner than Cochise was able to provide the same services. E ven during this time, there were questions about Cochise's capabilities to provide security services under the contract, and Quick suggested in response to Hill's that Cochise not be primarily designated as a "Class V and PSD primarily."

88.   After the "sole source award" of the subcontract was made to Cochise, Parsons discovered that Cochise did not have the capabilities to provide all of the services as set forth in the RFQ solicitation.   For example, and by no means exhaustive, Cochise did not have an adequate number of security personnel or armored vehicles. Consequently, to ensure Cochise retained the subcontract award, Parsons amended and/or modified the requirements originally established in the RFQ solicitation in order to match Cochise's capabilities and to give the appearance that Cochise was qualified to perform the requisite work under the subcontract.

89.   Dwight Hill's written justification for the awarding of the subcontract provides insufficient information was false or fraudulent and failed to fully consider all elements required by 48 C.F.R §6.302-2(b).

90.   Title 48 C.F.R. §6.302 states in pertinent part:

(a) Authority.
(1) Citations: 10 U.S.C. 2304(c)(2) or 41 U.S.C. 3304(a)(2).
(2) When the agency's need for the supplies or services is of such an unusual

and compelling urgency that the Government would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals, full and open competition need not be provided for.

(b) Application. This authority applies in those situations where—

(1) An unusual and compelling urgency precludes full and open competition; and

(2) Delay in award of a contract would result in serious injury, financial or other, to the Government.

(c) Limitations.

(1) Contracts awarded using this authority shall be supported by the written justifications and approvals described in 6.303 and 6.304. These justifications may be made and approved after contract award when preparation and approval prior to award would unreasonably delay the acquisition.

(2) This statutory authority requires that agencies shall request offers from as many potential sources as is practicable under the circumstances.

(d) Period of Performance.

(1) The total period of performance of a contract awarded or modified using this authority—

(i) May not exceed the time necessary—

(A) To meet the unusual and compelling requirements of the work to be performed under the contract; and

(B) For the agency to enter into another contract for the required goods and services through the use of competitive procedures; and

(ii) May not exceed one year, including all options, unless the head of the agency determines that exceptional circumstances apply. This determination must be documented in the contract file.

91.     Under 48 C.F.R. §6.302(b), not only must a contractor establish an unusual and compelling urgent need in order to avoid to full and open competition, but the contractor must also establish that delay in award of a contract would result in serious injury, financial or other, to the Government.

92.     Prior to this incident, every subcontract issued by Parsons in Iraq for the CMC had been put through a complete bid process. The Cochise subcontract was the first bid that Parsons ever relied upon 48 C.F.R 6.302-2(b) to justify a

no-bid subcontract.

93.     As a result of these false claims, the government paid in excess of $1 million more per month between February 2006 and September 2006 than it should have had ArmorGroup performed the contract. Additionally, Cochise's bid, unlike the other two company's bids, did not include <u>any</u> armored security vehicles.  Therefore, when Cochise tried  to provide security services under the contract, the government was forced to pay an excess of $2.9M in order for Cochise to acquire the requisite  vehicles.

94.     At the end of September 2006, Wayne Shaw rotated out of Iraq and Parsons immediately reopened the Cochise security subcontract for bidding and the contract was awarded finally to ArmorGroup.

95.     After Wayne Shaw left Iraq, he traveled to Kuwait City. There he was observed by Robert Riendeau, a Parsons employee, being picked up and escorted around the city by Jesse Johnson's son-in-law Steven Michael Scales.

96.     Relator has knowledge that Shaw spent three days in Kuwait City with Scales, where he was given improper gifts and gratuities by Cochise and/or their agents for his efforts in securing government contracts and subcontracts for Cochise Consultancy, Inc.

## **DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS**

97.     The False Claims Act ("FCA"), as amended, provides in pertinent part that:

[A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than \$5,500 and not more than \$11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990... plus 3 times the amount of damages which the Government sustains because of the act of that person.

U.S.C. § 3729(a)(l).

98. The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(l)(A). No proof of specific intent to defraud is required.  31 U.S.C. § 3729(b)(l)(B).

99. The Conduct described above violated the False Claims Act in at least three ways.

100. First, Defendants' conduct fraudulently induced at least one Government subcontract, including the Cochise Subcontract. Cochise, through Wayne Shaw, and Parsons, through Dwight Hill, partnered and conspired to use a combination of influence and favoritism to ensure that Cochise, with a far inferior bid to others, was awarded Subcontract No. 800618-60006 and Parsons'

Task Order 74475730003.

101.   In addition, Defendants agreed to work as a team to obtain the contract Award for Cochise to the exclusion of competitors and at the expense of fair competition.

102.   For example, Wayne Shaw was given improper gifts and gratuities by Cochise and/or their agents for Shaw's efforts in securing government contracts and subcontracts for Cochise Consultancy, Inc.

103.   Further, Hill fraudulently stated in correspondence related to the LMNP that that Cochise had "on the job" familiarity with the mission that other security providers did not have in order to justify the favorable treatment being afforded to Cochise by Parsons in making the subcontract Award.

104.   By engaging in this fraudulent course of conduct, Parsons and Cochise knowingly and materially caused the Government to pay out money related to Subcontract No. 800618-60006 and Parsons' Task Order 74475730003.

105.   Second, because Defendants had an affirmative legal obligation to engage in full and open competition, the failure to engage in competitive bidding under false pretenses resulted in express and/or implied false certifications being made to the government by Parsons and Cochise. The Government's entry into subcontracts with Cochise, and payment of claims pursuant to those subcontracts was premised upon (i) Defendants' express and/or implied false certifications that there was an unusual and compelling urgent need for services that precluded full

and open competition; (ii) that other potential subcontractor service providers were requested and considered as soon as practicable under the circumstances following the award to Cochise; and (iii) that the award to Cochise did not exceed the time necessary to meet the unusual and compelling requirements of the work to be performed under the subcontract.

106.   Dwight Hill's written justification for the awarding of the subcontract to Cochise under the guise of an unusual and compelling urgency was false or fraudulent and Hill and Parsons knew that said justification was false or fraudulent.

107.   On February 21, 2006, at the time Hill and Parsons decided that the subcontractor award to Cochise was "being made in accordance with 48 C.F.R 6.302-2(b) - Unusual and compelling urgency," Hill and Parsons knew that truthfully, 48 C.F.R 6.302-2(b) was inapplicable with respect to Cochise.

108.   From February 2006 and September 2006 Parsons billed the Government every two weeks by delivering printed Parsons' invoices to the COE in Huntsville, Alabama, along with a disc containing the same invoices, for subcontract work related to Subcontract No. 800618-60006 and Parsons' Task Order 74475730003.   Each of the bi-monthly invoices referenced above contained requests for payment for services allegedly performed by Cochise.

109.   Within approximately thirty days of receiving the invoices referenced in the preceding paragraph, the COE would remit payment to

Defendant Parsons who, in turn, would generally reimburse itself for payments Parsons made in response to invoices submitted by Cochise to Parsons.

110.   With each invoice and/or billing statement submitted by Parsons to the Government, Parsons expressly and/or implicitly certified to the Government that it (Parsons) had engaged in full and open competition as required by applicable federal laws concerning Subcontract No. 800618-60006 and Parsons' Task Order 74475730003; the subcontract awarded to Cochise.

111.   By engaging in this fraudulent course of conduct, Parsons and Cochise knowingly and materially caused the Government to pay out money related to Subcontract No. 800618-60006 and Parsons' Task Order 74475730003.

112.   Third, because Defendant Parsons knowingly billed the COE and received payment from the Government for services procured and performed in violation of the Anti-Kickback Act of 1986, 41 U.S.C. § 51-58, and because it and Cochise knowingly violated federal legal, regulatory and contractual obligations to engage in full and open competition and/or competitive bidding, both Defendants had an obligation to pay back to the Government money and/or funds it received as payment for illegally obtained services performed by Cochise. Parsons and Cochise concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the Government.  The failure to transmit said money or property to the Government was a continuing violation.

113.   By engaging in this fraudulent course of conduct, Parsons and Cochise

knowingly and materially caused the Government to pay out money related to Subcontract No. 800618-60006 and Parsons' Task Order 74475730003.

114.   In addition, the Defendants used the above-described conduct to obtain subcontracts, and specifications under the CMC program from some time prior to January 2006 until early 2007. They used the above-described conduct to obtain and award the Subcontract to Cochise. Defendants are continuing to seek further government contracts, subcontracts, and specifications today.

115.   Defendants knew, or recklessly disregarded, that their conduct was illegal and fraudulent. The prohibition on the appearance of conflicts of interest, the unmitigated conflicts of interest and gratuities to public officials is stated clearly and repeatedly in the United States Code, the Code of Federal Regulations, and, on information and belief, in the contracts at issue in this case.  As contractors with substantial government business (and with numerous sales and management positions dedicated to sales to the federal government), Defendants knew that the law prohibited them from buying or exploiting government influence and favoritism with gratuities and personal  relationships.

116.   Through their conduct and agreements, which were intended to and did eliminate competition for the Cochise subcontract at issue, Defendants were able to charge higher prices for their goods and services under the CMC program than the Government would have paid if the bidding and specification process were conducted in a fair and competitive manner.

117.   Upon information and belief, the aforementioned conduct represents a concerted conspiracy by the Defendants, and others, to improperly and fraudulently award the Cochise Subcontract to Cochise Consultancy, Inc.

## STATEMENT OF CLAIMS

### COUNT I
### Violation of Federal False Claims Act 31 U.S.C. §§ 3729(a)(l) and/or 31 U.S.C. §§ 3729(a)(l)(A)
### (Against All Defendants)

118.   Relator realleges and incorporates by reference the allegations contained in ¶¶ 1-9; ¶¶16-36; ¶¶ 37-50; and ¶¶ 51-102 of this Complaint.

119.   Relator seeks relief against Defendants under §3729 (a)(1) and/or 31 U.S.C. §3729(a)(1)(A) Defendants of the False Claims Act, 31 U.S.C. §3729 et seq.

120.   The Anti-Kickback Act of 1986, 41 U.S.C. § 51-58, prohibits any person receiving funds from the U.S. Government from (1) providing or attempting to provide or offering to provide any kickback; (2) soliciting, accepting or attempting to accept any kickback; or (3) including, directly or indirectly, the amount of any kickback in the contract price. See 41 U.S.C. § 51-58; 41 U.S.C. § 52-53.

121.   The kickback and/or bribery scheme between Cochise, Wayne Shaw, and Parsons resulted in Parsons billing the Government for tainted and illegal services performed by Cochise related to Subcontract No. 800618-60006 and Parsons' Task Order 74475730003.   Therefore, Defendants Parsons and Cochise received payment from the Government for services performed pursuant to illegal

referrals or attempted referrals or solicitations in violation of the Anti-Kickback Act of 1986.

122.   In addition, the Government requires "that contracting officers shall promote and provide for full and open competition in soliciting offers and awarding Government contractors." 48 C.F.R. §6.101. The FCA imposes liability and penalties on all claims submitted under government contracts that were fraudulently induced, including by payment of illegal gratuities or schemes to subvert competition in contract bidding.

123.   The requirement to promote and provide full and open competition is also applicable to Parsons – a general contractor acting on an agency's behalf to acquire subcontractor services for a Government contract. See 41 U.S.C.A. §3301 and 48 C.F.R. §6.101.

124.   Together, these provisions render compliance with full and open competition, anti-kickback, anti-bribery and anti-gratuity laws an explicit condition of participation in government contracts.

125.   Defendants Parsons and Cochise knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval (expressly or implicitly) by virtue of billing the Government for tainted and illegal services performed by Cochise related to Subcontract No. 800618-60006 and Parsons' Task Order 74475730003.

126.   Further, each such claim was tainted by Defendants' failure to provide

37

full and open competition, fraudulent conflicts of interest, the provision of illegal kickbacks, bribes, and/or gratuities and the collusion between Cochise, Parsons, Jesse Johnson, Dwight Hill and Wayne Shaw that eliminated competition and resulted in the fraudulent award of subcontracts or contracts.

127.  As a direct and proximate cause of Defendants Parsons and Cochise's false or fraudulent conduct, pattern practice of fraud, and their illegal actions, the United States has paid directly or indirectly numerous false claims and spent millions of dollars.

128.  Damages to the United States Government include, but are not limited to, up to the full amount it has paid to the Defendants on such fraudulent claims, plus treble damages.

129.  By reason of the violation of 31 U.S.C. §3729(a)(1) and/or 31 U.S.C. §3729(a)(1)(A) Defendants Parsons and Cochise have knowingly or recklessly damaged the United States Government in an amount to be determined at trial.

WHEREFORE, the Relator, on behalf of himself and the United States Government, prays:

> (a) That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500-$11,000 for each action in violation of 31 U.S.C. §3729, and the cost of this action, with interest, including

the cost to the United States Government for its expenses related to this action.

(b)     That the Relators be awarded all costs incurred, including reasonable attorney's fees.

(c)     That in light of the fact that the United States Government has declined to proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be no less than 25% nor more than 30% of the proceeds of the action or settlement.

(d)     That the Relator be awarded prejudgment interest.

(e)     That a trial by jury be held on all issues.

(f)     That the United States Government and the Relators receive all relief, both at law and at equity, to which they may reasonably be entitled.

## COUNT II
## Violation of Federal False Claims Act 31 U.S.C. §3729(a)(3) and/or 31 U.S.C. §3729(a)(1)(C)
## (Against All Defendants)

130.    Relator realleges and incorporates by reference the allegations contained in ¶¶ 1-9; ¶¶16-36; ¶¶ 37-50; and ¶¶ 51-102 of this Complaint.

131.    Relator seeks relief against Defendants under §3729 (a)(3) and/or 31 U.S.C. §3729(a)(1)(C) of the False Claims Act, 31 U.S.C. §3729 et seq.

132.    Defendant Parsons and Defendant Cochise conspired with each other

and with Wayne Shaw to rig the evaluation process of subcontracts to ensure the use of Cochise's services or to ensure the selection of Cochise as a prime subcontractor.

133.   Defendant Parsons and Defendant Cochise conspired with each other and with Dwight Hill and Wayne Shaw to rig the full and open competition process and/or competitive bidding process in order to make a sole source award of Subcontract No. 800618-60006 to Cochise.

134.   In performing all of the acts described herein, Defendants Parsons and Cochise have defrauded the United States of America by conspiring to violate 31 U.S.C.§§3729(a)(1),   (a)(2),   and   (a)(7);   and/or   violate   31   U.S.C.§§3729 §§3729(a)(1)(A) (B), and (G) in contravention of the False Claims Act, 31 U.S.C. §3729(a)(3), and/or 31 U.S.C. §3729(a)(1)(C), to the damage of the Treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.  In carrying out these wrongful acts, Defendants Parsons and Cochise have engaged in a protracted course of conduct and pattern of fraudulent conduct that was material to false claims for payment that Defendants presented or caused to be presented to the United States.

135.   As a direct and proximate cause of Defendants' illegal actions and pattern of fraudulent conduct, the United States has been damaged.

136.   By reason of Defendants' false or fraudulent claims and violations of 31 U.S.C. §§ 3729 (a)(3) and/or 31 U.S.C. §3729(a)(1)(C), Defendants Parsons and

Cochise have knowingly or recklessly damaged the United States Government in an amount to be determined at trial.

WHEREFORE, the Relator, on behalf of himself and the United States Government, prays:

(a) That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500-$11,000 for each action in violation of 31 U.S.C. §3729, and the cost of this action, with interest, including the cost to the United States Government for its expenses related to this action.

(b) That the Relators be awarded all costs incurred, including reasonable attorney's fees.

(c) That in light of the fact that the United States Government has declined to proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be no less than 25% nor more than 30% of the proceeds of the action or settlement.

(d) That the Relator be awarded prejudgment interest.

(e) That a trial by jury be held on all issues.

(f) That the United States Government and the Relators receive all

relief, both at law and at equity, to which they may reasonably be

entitled.

**COUNT III**
**Violation of Federal False Claims Act 31 U.S.C. §3729(a)(2)**
**(Parsons)**

137.   Relator realleges and incorporates by reference the allegations contained

in ¶¶ 1-9; ¶¶16-36; ¶¶ 37-50; and ¶¶ 51-102 of this Complaint.

138.   Relator seeks relief against Defendants under §3729 (a)(2) of the False

Claims Act, 31 U.S.C. §3729 et seq.

139.   As set forth above, Defendants Parsons has knowingly made, used or

caused to be made or used, a false records or statement material to get a false or

fraudulent claim paid or approved by the Government, to wit: Parsons, by and through

Dwight  Hill, made, used, or caused to be made or used  an  email  containing a

Limited Notice to Proceed (LMNP) and an interoffice correspondence stating that

an exception set forth in  48 C.F.R §6.302-2(b) was applicable and therefore

precluded  Parsons' obligation to engage in full and open competition with respect

to  Subcontract No. 800618-60006. Thus, the foregoing records and statements

were used to award Subcontract No. 800618-60006 to Cochise.

140.   At all material times herein, Parsons intended the foregoing records and

statements to influence  the  Government's  decision  to  pay  money  related  to  the

aforementioned subcontract.

141.   As a direct and proximate cause of Defendant's false or fraudulent and illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims and spent millions of dollars.

142.   Damages to the United States Government include, but are not limited to, up to the full amount it has paid to the Defendants on such fraudulent claims, plus treble damages.

143.   By reason of the violation of 31 U.S.C. §3729(a)(2) Defendant Parsons has knowingly or recklessly damaged the United States Government in an amount to be determined at trial.

WHEREFORE, the Relator, on behalf of himself and the United States Government, prays:

> (a)   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500-$11,000 for each action in violation of 31 U.S.C. §3729, and the cost of this action, with interest, including the cost to the United States Government for its expenses related to this action.

> (b)   That the Relators be awarded all costs incurred, including reasonable attorney's fees.

43

(c) That in light of the fact that the United States Government has declined to proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be no less than 25% nor more than 30% of the proceeds of the action or settlement.

(d) That the Relator be awarded prejudgment interest.

(e) That a trial by jury be held on all issues.

(f) That the United States Government and the Relators receive all relief, both at law and at equity, to which they may reasonably be entitled.

## COUNT IV
## Violation of Federal False Claims Act 31 U.S.C. §3729(a)(1), 31 U.S.C. §3729(a)(1) (A) and 31 U.S.C. §3729(a)(2)
## (Against All Defendants)

144. Relator realleges and incorporates by reference the allegations contained in ¶¶ 1-9; ¶¶16-36; ¶¶ 37-50; and ¶¶ 51-102 of this Complaint.

145. Relator seeks relief against Defendants under §3729(a)(1), §3729(a)(1) (A) and §3729 (a)(2) of the False Claims Act, 31 U.S.C. §3729 et seq.

146. As set forth above, Defendants Parsons and Cochise knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval vis-à-vis false certifications, express and/or implied.

147. As set forth above, Defendants Parsons and Cochise knowingly made,

used or caused to be made or used, a false records or statement material to get a false or fraudulent claim paid or approved by the Government vis-à-vis false certifications, express and/or implied.

148. With each invoice and/or billing statement submitted by Parsons to the Government, Parsons expressly and/or implicitly certified to the Government that it (Parsons) had engaged in full and open competition as required by applicable federal laws concerning Subcontract No. 800618-60006 and Parsons' Task Order 74475730003; the subcontract awarded to Cochise.

149. With each invoice and/or billing statement submitted by Parsons to the Government, Parsons expressly and/or implicitly certified to the Government that it (Parsons) had complied with federal laws prohibiting violations of the Anti-Kickback Act of 1986.

150. As a direct and proximate cause of Defendants' false or fraudulent and illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims and spent millions of dollars.

151. Damages to the United States Government include, but are not limited to, up to the full amount it has paid to the Defendants on such fraudulent claims, plus treble damages.

152. By reason of the violation of 31 U.S.C. §3729(a)(1), §3729(a)(1) (A) and 31 U.S.C. §3729(a)(2) Defendants Parsons has knowingly or recklessly damaged the United States Government in an amount to be determined at trial.

WHEREFORE, the Relator, on behalf of himself and the United States Government, prays:

     (a)    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500-$11,000 for each action in violation of 31 U.S.C. §3729, and the cost of this action, with interest, including the cost to the United States Government for its expenses related to this action.

     (b)    That the Relators be awarded all costs incurred, including reasonable attorney's fees.

     (c)    That in light of the fact that the United States Government has declined to proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be no less than 25% nor more than 30% of the proceeds of the action or settlement.

     (d)    That the Relator be awarded prejudgment interest.

     (e)    That a trial by jury be held on all issues.

     (f)    That the United States Government and the Relators receive all relief, both at law and at equity, to which they may reasonably be entitled.

## COUNT V
## Violation of Federal False Claims Act 31 U.S.C. §3729(a)(7) and 31 U.S.C. §3729(a)(1)(G)
## (Against All Defendants)

153.   Relator realleges and incorporates by reference the allegations contained in ¶¶ 1-9; ¶¶16-36; ¶¶ 37-50; and ¶¶ 51-102 of this Complaint.

154.   Relator seeks relief against Defendants under §3729(a)(7) and §3729 (a)(1)(G) of the False Claims Act, 31 U.S.C. §3729 et seq.

155.   By virtue of the acts described above, Defendants Parsons and Cochise knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

156.   As a direct and proximate cause of Defendants' false or fraudulent and illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims and spent millions of dollars in which it is entitled to a refund for overpayment.

157.   Damages to the Government are ongoing and continuous and include, but are not limited to, up to the full amount it has paid to the Defendants on such fraudulent claims, plus treble damages.

158.   By reason of the violation of§ 3729(a)(7) and § 3729 (a)(1)(G) Defendants Parsons and Cochise have knowingly or recklessly damaged the

United States Government in an amount to be determined at trial.

WHEREFORE, the Relator, on behalf of himself and the United States Government, prays:

(a) That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500-$11,000 for each action in violation of 31 U.S.C. §3729, and the cost of this action, with interest, including the cost to the United States Government for its expenses related to this action.

(b) That the Relators be awarded all costs incurred, including reasonable attorney's fees.

(c) That in light of the fact that the United States Government has declined to proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be no less than 25% nor more than 30% of the proceeds of the action or settlement.

(d) That the Relator be awarded prejudgment interest.

(e) That a trial by jury be held on all issues.

(f) That the United States Government and the Relators receive all relief, both at law and at equity, to which they may reasonably be

entitled.

## TOLLING OF STATUTE OF LIMITATIONS

159.   Any applicable Statute of Limitations to Relators claims have been

tolled by 18 US.C.A § 3287.

Respectfully submitted,


 _/s/ Larry A. Golston
Larry A. Golston (GOL029)
Leon Hampton, Jr. (HAM105)
Attorneys for Plaintiff

OF COUNSEL:
**BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax:   (334) 954-7555




/s/ Gary V. Conchin
Gary V. Conchin (ASB-1263-C56G)
Attorney for Plaintiff

OF COUNSEL:
CONCHIN, COLE & JORDAN
2404 Commerce Court
Huntsville, Alabama 35801
(256) 705-7777 – telephone
(256) 705-7778 – facsimile
 gary@alainjurylaw.com

## **JURY DEMAND**

PLAINTIFF HEREBY DEMANDS TRIAL BY JURY ON ALL ISSUES OF
THIS CAUSE.

/s/ Larry A. Golston
Of Counsel

**FILED IN CAMERA AND UNDER SEAL**
**DO NOT SERVE DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the foregoing document upon all counsel of record as listed below by placing the same in the United States mail, properly addressed and first-class postage prepaid and emailed on this the 27th day of January, 2021.

James M Carter, Esq.
Aaron S Dyer, Esq.
Kevin Reza Massoudi, Esq.
Michael R Rizzo, Esq.
PILLSBURY WINTHROP SHAW PITTMAN LLP
725 South Figueroa Street Suite 2800
Los Angeles, CA 90017
213-243-7120
213-629-1033 (fax)
matt.carter@pillsburylaw.com
aaron.dyer@pillsburylaw.com
kevin.massoudi@pillsburylaw.com
irma.magana@pillsburylaw.com

Jeffrey P. Doss, Esq.
Jackson R Sharman, III, Esq.
LIGHTFOOT FRANKLIN & WHITE LLC
400 20th Street North
Birmingham, AL 35203
205-581-0700
205-380-9346 (fax)
jdoss@lightfootlaw.com
jsharman@lfwlaw.com

Duane A Daiker, Esq.
Robert Warchola, Esq.
SHUMAKER LOOP & KENDRICK LLP
101 E Kennedy Boulevard Suite 2800
Tampa, FL 33602
813-227-2329
813-229-1660 (fax)
ddaiker@slk-law.com
rwarchola@slk-law.com