## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BILLY JOE HUNT,** | ) | |
| *for the use and benefit of* | ) | |
| **United States of America,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.  5:13-cv-2168-LCB** |
| | ) | |
| **COCHISE CONSULTANCY,** | ) | |
| **INC.,** *d/b/a* **COCHISE** | ) | |
| **SECURITY,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Before the Court is Relator Billy Joe Hunt's First Amended Complaint, Doc. 118, and Defendants' motions for summary judgment. Docs. 213, 220. Hunt's operative complaint asserts that Cochise Consultancy, Inc., and the Parsons Corporation violated the False Claims Act (FCA), 31 U.S.C. § 3729, *et seq.*, by conspiring to award Cochise a subcontract it was not qualified to receive and falsely certifying that the bid process complied with federal laws and regulations. Doc. 118 at 36. But because Hunt has abandoned the bribery and kickback allegations at the core of his FCA claims and failed to prove his alternative theories of liability, the Court **WILL GRANT** the Defendants' motions for summary judgment.

1

## I.    Background

### A.    Factual Background

When the United States launched its campaign against Saddam Hussein in 2003, few imagined that the war in Iraq would continue (in one form or another) for two decades, that it would cost 4,599 American servicemen and women and 3,650 government contractors their lives, and that it would cost the U.S. government an estimated $1.79 trillion. Crawford, Neta, *Blood and Treasure: United States Budgetary Costs and Human Costs of 20 Years of War in Iraq and Syria, 2003-2023* at 1, 14 (Brown University, Watson Institute for International & Public Affairs) (2023), available at https://perma.cc/GD8L-EA8Z. This case is about where some of that $1.79 trillion went, how it got there, and whether it got there legally.

In 2004, as the contours of the Iraq conflict were shifting from a traditional campaign against the Iraqi military to a nation-building and anti-insurgency effort, the United States began hiring civilian contractors to help it find and dispose of munitions left behind by Saddam's forces. That September, the United States Army Corps of Engineers (USACE) awarded one such munitions clean up contract (the CMC Contract) to the Parsons Corporation, a large defense contractor. Doc. 221-23. In late January 2006, USACE "funded Task Order 10," an amendment to the CMC contract "which required Parsons to hire a subcontractor to provide Class V security (logistical convoys transporting explosives and ordnances) and Personnel Security

Detail ('PSD') services (protection of people, including both USACE officials and Parsons employees, as they moved between sites outside of established U.S. military bases in Iraq) and the operation of a 'reception facility in Kuwait[.]'" Doc. 220 at 13 (citing Doc. 221-24).

Defendant Cochise Consultancy was also active in Iraq as a civilian contractor, including work providing at least some Class V and PSD services for USACE. Doc. 216-3. Although the full scope of Cochise's prior work for USACE is unclear, Parsons' bid evaluation stated that Cochise "was currently subcontracted . . . to provide some Class V and PSD functions for the USACE," Doc. 216-4 at 3, and an internal Parsons memo described Cochise as USACE's "incumbent provider" and stated that Cochise "had been providing [Class V and PSD] services under a subcontract to U.S.A. Environmental (USAE) for the previous 2 years." Doc. 221-18; *see also* Doc. 221-26 at 8 (Cochise capability document highlighting a 2003 contract with USAE and USACE to "provid[e] Convoy and Site Security for the Captured Enemy Ammunition program"); Doc. 231-1 at 23, 33 (testimony of Guy Irvin that the contractual relationship between Cochise and U.S.A. Environmental was "self-evident").

On January 18, 2006—before USACE had formally funded Parsons' proposal—Parsons sent a request for quotation (RFQ) to "to companies with which it [already] had a Basic Ordering Agreement ('BOA')," which is "essentially a pre-

3

approval of a company's ability to perform as a subcontractor based on an analysis of both its technical and financial capabilities." Doc. 220 at 4-5, 14. Parsons did not send an RFQ to Cochise "because Cochise did not have a[n existing] BOA" with Parsons. *Id.* at 14.

On January 24, Jesse Johnson, owner and president of Cochise, emailed Guy Irvin, Parsons' Country Security Manager in Iraq (CSM Irvin), with the "objective" of "get[ting Cochise] entered into the procedure to submit a bid" for the Class V/PSD contract and entering a BOA with Parsons. Doc. 221-77 at 3. Cochise submitted the documents required for a BOA, and the following day CSM Irvin sent Parsons Senior Subcontract Administrator Dwight Hill (SSA Hill) an email stating that "[h]aving evaluated Cochise from a technical standpoint" he found "them acceptable for inclusion into our Basic Ordering Agreement." Doc. 216-3 at 2.

Following SSA Hill's evaluation, Parsons decided to re-issue its RFQ for the subcontract "at the insistence and direction" of USACE Project Manager Wayne Shaw (PM Shaw).[1] Doc. 234 at 15. The reasons for USACE and PM Shaw's insistence aren't clear from the record, but Parsons' sole-source justification memo stated that Parsons canceled "[t]he initial bid process . . . due to the lack of

---

[1] Hunt continues to use this fact to suggest impropriety, but has abandoned his allegation that Cochise gave PM Shaw bribes and gratuities "[i]n return for the favorable treatment." (Doc. 118 at 4). Without more, no reasonable jury could conclude that PM Shaw's concern for the exclusion of an incumbent vendor from the bidding process was criminal. *U.S. ex rel., Kaimowitz v. Ansley*, 250 F. App'x 912, 914 (11th Cir. 2007) (holding that "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

competitive range," since just two firms submitted bids. Doc. 221-18. In any event, USACE "requested that Cochise be added to the bidders list during the second bid attempt," and on February 8, Parsons issued a new RFQ to six total firms, including Cochise, with a bid deadline of February 10, 2006. Doc. 221-34.

Three companies submitted bids this time—Sabre International Security, ArmorGroup, and Cochise. Doc. 216-4. Crucially, ArmorGroup told Parsons that it needed twenty-six days to train and mobilize personnel, Doc. 221-3 at 18, while Cochise's proposal stated that it had "personnel currently in country" who "will remain in country and will be immediately ready to assume the mission." Doc. 216-13 at 2.

The afternoon of February 11, 2006, one day after the bid deadline, USACE PM Shaw emailed contacts at Parsons, including Billy Joe Hunt (the relator here), who was serving as Deputy Program Manager of Operations for Parsons on the CMC Program. Doc. 221-36; *see* Doc. 216-6. PM Shaw stated that "[a]fter evaluating the proposals submitted for the PSD/Class V convoy missions," it was his "opinion that the contractor that can best accomplish the mission is Cochise Consultancy." Doc. 221-36. The view inside Parsons differed—the same day, Parsons Procurement Manager Hoytt Runnels (PPM Runnels) issued a memo evaluating the proposals, concluding that "[t]he proposal from Armor Group represents a cohesive and best in

class proposal, and represents the best value for the government in performance of the assigned missions." Doc. 221-35 at 6.

On February 13, PPM Runnels acknowledged PM Shaw's endorsement of Cochise, but informed Gaines Newell (PM Newell)—Parsons' project manager for the CMC contract—that while he "ha[d] no problem with" selecting Cochise, he would "need something more specific ([a] directive) from the client." Doc. 221-37 at 5. PM Newell then asked Relator Hunt to "get with" USACE, specifically PM Shaw and USACE Contracting Officer Steven Hamilton (CO Hamilton), to request that USACE "issue [Parsons] a directive" to hire Cochise. *Id.* at 4. The next day, CO Hamilton ordered Parsons to award the subcontract to Cochise. Doc. 221-38. To support the directive, CO Hamilton stated that "[e]ven though Cochise cost was the highest of the three proposals, the selection was based upon [Cochise's] ability to provide qualified . . . drivers and authorized weapons systems contained in their proposal." *Id.*

Parsons employees immediately expressed strong reservations about the directive, which is puzzling, given that Parsons' staff requested it. PPM Runnels forwarded the directive to SSA Hill, describing it as a directive "to award to the highest bidder." Doc. 221-40 at 4. PPM Runnels also stated that USACE was "insisting a security team be on the ground and ready to go by Feb. 18," *id.*, and that

"the selection process has been severely circumvented by [USACE] involvement." Doc. 221-39 at 4.

Once apprised of the situation, CSM Irvin recommended that ArmorGroup be awarded the contract "[u]nless we are specifically instructed/ordered by the client to Sole Source this requirement (in writing)." Doc. 221-39 at 3. Later, CSM Irvin clarified that he thought USACE's stated rationale for selecting Cochise was a "weak . . . justification," and recommended that Parsons "document [its] objections as to why we non-concur should this become an issue in the future (and it very well could). We'll salute and march forward but at least we will have done the dutiful thing and voiced our concerns." Doc. 221-40 at 2. And on Tuesday evening PPM Runnels emailed his Parsons colleagues to state that "[j]ust so everyone is clear, everyone from the project from [Project Manager] Gaines [Newell] down is opposed to the choice made by [USACE]." Doc. 221-39 at 2.

On February 15, Parsons Program Manager Tim Hiles (PM Hiles) raised Parsons' concerns with Cheryl Jones (CO Jones), Doc. 221-41, USACE's primary contracting officer in Huntsville. Doc. 221-14 at 6. Two days later, CO Hamilton rescinded his directive to award the contract to Cochise, without providing a reason. Doc. 221-42.

But USACE's rescission of the formal directive was short lived. The same day CO Hamilton rescinded his directive, CO Jones emailed USACE colleagues CO

7

Hamilton and PM Shaw with the subject line: "Parsons to subcontract with Cochise for Class V and PSD requirement." Doc. 221-4. CO Jones stated that she had spoken with Parsons PM Hiles twice that day, and that he had informed her of Parsons plan to "sole source" the contract "to Cochise (based on urgency) to meet mission deadlines." *Id.* CO Jones also stated that Parsons was initially "discussing sending out a new RFP" until USACE "asked them how they planned on getting all this done by [February] 18th and [said] they may want to reconsider their game plan since they have had this requirement since . . . Jan[uary 27th]." *Id.* CO Jones also explained that the decision to go with Cochise was made in part based on two criteria: "[t]he Government's objective" was "to get a contractor with a good track record to perform the critical Class V and PSD convoys," and the "mission objective" was "getting [a] subcontract in place pronto." *Id.*

With that, Parsons and Cochise began putting the pieces in place for Cochise to start work on the contract. On February 18, 2006, Parsons executed a BOA with Cochise. Doc. 221-15. Two days later, Parsons issued Cochise a "Limited Notice to Proceed," authorizing Cochise "to proceed with the subject work effort" from February 22, 2006 through March 8, 2006, pending execution of the subcontract. Doc. 216-16. On February 21, 2006, SSA Hill issued an "interoffice correspondence" justifying the sole source award to Cochise based on the "urgent and immediate need surrounding convoy security requirements." Doc. 221-16 at 6.

8

In any event, the subcontract appears to have been fully executed by both parties no later than February 27, 2006. Cochise CEO Johnson signed the subcontract on February 18, 2006, Doc. 221-73 at 17, and Cochise's vouchers to Parsons show a contract date of February 27, 2006. *See* Doc. 233-6. Six months later, Parsons informed Cochise that it planned to re-bid the subcontract, and asked Cochise to submit a bid, but Cochise declined. Doc. 216-18. Cochise worked on the contract through early October 2006. Doc. 216-20 at 38.

Beginning in 2010, Relator Hunt cooperated with an FBI investigation into contract fraud in Iraq, during which he "admitted to participating in a [separate] kickback scheme related to his employment as a Deputy Project Manager for The Parsons Corporation." Doc. 118 at 10. In 2012, Relator Hunt pled guilty to federal tax and kickback charges. Doc. 221-31. Hunt served a ten-month sentence, Doc. 118 at 10-11, and filed this lawsuit on November 27, 2013, following his release from prison. Doc. 1.

### B.    Procedural Background

The recitation of twelve years of litigation here would take a small mountain of paper—this case has been actively litigated since 2013, including a trip up to the Supreme Court and back down again. Furthermore, the procedural history has been repeatedly summarized by the Court throughout this litigation, most recently in the Court's denial of Defendants' motions to dismiss. Doc. 103. Following that denial,

Hunt filed an amended complaint, Doc. 118, the parties conducted further discovery, and Defendants moved for summary judgment. Docs. 213, 220. The Court has heard oral arguments on the summary judgment motions, which are fully briefed and ripe for decision.

## II.      Summary Judgment Standard

The Federal Rules of Civil Procedure dictate that "summary judgment is appropriate where the pleadings, affidavits, depositions, admissions, and the like 'show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015) (cleaned up and quoting Fed. R. Civ. P. 56(a)). Further, courts must "constru[e] the evidence and all reasonable inferences therefrom in favor of the nonmoving party." *Id.* Even so, the nonmovant can't survive summary judgment unless it "offer[s] more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Id.*

## III.      Analysis

Relator Hunt's true theory of the case, and therefore the parties' best arguments for and against summary judgment, did not become clear until Hunt's opposition to summary judgment. There, Hunt conceded for the first time that he is no longer pursuing the bribery and kickback allegations in his complaint. Instead,

Hunt says that he only alleges false certification and conspiracy claims under the FCA against Cochise and Parsons. Hunt's theory is that Cochise and Parsons knowingly failed to engage in competitive bidding as required by law, conspired to do so, and thus submitted false certifications to the government that Cochise's work was proper for payment.

With that newfound clarity, both Cochise and Parsons reply that Hunt's amended complaint centers on an alleged bribery and kickback scheme, and therefore that Hunt's abandonment of those claims is fatal. The Court agrees, and finds that Defendants are entitled to summary judgment because Hunt has not pointed to anything in the record that would allow a reasonable jury to conclude that Defendants violated the False Claims Act.

### A. Defendants are entitled to summary judgment on all claims because the government was fully aware of the bidding and award process.

At the outset, Hunt's claims fail because the government was—at a minimum—aware of serious flaws in the bidding and award process, which negates the FCA's scienter requirement.

As Hunt acknowledges, without the bribery and kickback allegations, his complaint rests on a "false certification" theory of liability. *See* Doc. 230 at 12, 15. To prove a false certification claim, a "relator must prove (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was

material, causing (4) the government to pay out money or forfeit moneys due." *Urquilla-Diaz*, 780 F.3d at 1045 (cleaned up). Even so, because scienter is "a necessary element of [a] false certification claim," *id.* at 1057, government knowledge of specific problems with a claim before the claim is submitted can wipe out the FCA's required scienter element, and therefore the entire false certification claim. *U.S. ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999).[2]

The Seventh Circuit's decision in *Durcholz* is instructive. There, the Crane Naval Surface Warfare Center needed to hire a contractor to clear two clogged sedimentation ponds to remain compliant with environmental regulations. *Id.* at 543-44. To expedite the project, Crane officials "decided to have the ponds dredged, a method which is faster, but more expensive, than conventional excavation." *Id.* at 544.

Then, to "speed up" the subcontracting process, "Crane officials classified the project as a 'performance specification,' which . . . requir[ed] the use of conventional line-items from the Unit Price Book (UPB)," even though "the UPB [did] not contain line-items for dredging, and the winning

---

[2] Although the Court can find no Eleventh Circuit precedent adopting this exact holding, the Court agrees that "[m]ost of our sister circuits have held that under some circumstances, the government's knowledge of the falsity of a statement or claim can defeat FCA liability on the ground that the claimant did not act 'knowingly', because the claimant knew that the government knew of the falsity of the statement and was willing to pay anyway." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (en banc) (E. Jones, J., concurring).

bidder could, under the governing regulations, complete the project however it liked, whether by dredging or by excavation." *Id.* at 544. The prime contractor, FKW, told potential bidders of Crane's unwritten dredging requirement, but also said bidders would be allowed to submit excavation bids, per the UPB. *Id.*

Durcholz Excavating and Construction submitted the lowest dredging bid by nearly $100,000 and specified that it could complete the project by either method. *Id.* Yet "Crane officials with decision-making authority believed that Durcholz's bid was for excavation only," and the higher dredging bid won the contract. *Id.* Durcholz sued FKW, alleging that it violated the FCA by using UPB line items, which did not contain a dredging option, to submit invoices for dredging. *Id.* Durcholz also brought an FCA conspiracy claim, alleging that "FKW conspired with" Crane's civilian contracting specialist "to withhold Durcholz's bid and to award the bid to" the higher bidder. *Id.* at 545.

The district court granted summary judgment for FKW because "the Crane officials' knowledge—that FKW's proposal and invoices used excavation line-items for the dredging project—barred Durcholz's FCA claims." *Id.* The Seventh Circuit affirmed that decision, holding that where "the government knows and approves of the particulars of a claim for payment

before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim" which "effectively negates the fraud or falsity required by the FCA." *Id.*

The FCA's scienter requirement is similarly erased here. As in *Durcholz*, USACE officials knew that Parsons was circumventing the competitive bidding process to sole-source the award to Cochise, which "bar[s Hunt]'s FCA claims." *Id.* Not only that, but the undisputed facts also show that USACE was aware of issues with the bidding process because *Parsons* raised those concerns to the government. Hunt does not dispute that "[PM] Hiles . . . escalated Parsons' concerns" about sole-sourcing the contract to Cochise to USACE CO Cheryl Jones. Doc. 220 at 18; instead, Hunt only disputes the characterization of CO Jones as CO Hamilton's superior. Doc. 234 at 11.

Indeed, although Hunt has not alleged that CO Jones was a participant in any FCA violation, no reasonable jury could conclude that her email was meant to do anything other than force Parsons to select Cochise. Doc. 221-4. According to CO Jones' email, it was USACE, not Parsons, who reiterated the February 18th deadline after *Parsons* suggested re-bidding the contract. Doc. 221-4. And it was USACE who reminded Parsons that the "mission objective" was "getting [a] subcontract in place pronto." *Id.* But Cochise was

the only bidder who had the capacity to start work by USACE's February 18th deadline. Doc. 216-13 at 2. Parsons got USACE's message loud and clear: "the only option available to [Parsons] was to sole-source to Cochise." Doc. 221-8 at 6, 7.

Even after viewing those facts in a light favorable to Hunt, Hunt's complaint is reduced to an "alleg[ation] that the government was defrauded by the very activities that its agents ordered." *Durcholz*, 189 F.3d at 545. USACE "not only knew that" Parsons would sole-source the contract to Cochise, despite its price and shortcomings, but unsubtly directed Parsons to circumvent the normal bid process, and no reasonable jury could hold Parsons "liable for defrauding the government by following the government's explicit directions." *Id.* Because the undisputed evidence shows that the "government knew what it wanted, and it got what it paid for," *id.*, the Court will grant summary judgment for Defendants on all counts.

> ### B.    Defendants are entitled to summary judgment as a matter of law on Count I.

In Count I, Hunt alleges that Defendants violated 31 U.S.C. § 3729(a)(1)(A), which makes liable "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."[3] The grounds for Hunt's claim

---

[3] In his opposition to Cochise's motion for summary judgment, Hunt claims that he is "proceed[ing] against Cochise only on Count II (Conspiracy) and Count IV (False Certifications)," (Doc. 230 at 11 n. 38), but goes on to address Count V. *Id.* at 16. To avoid any confusion, the Court will address all five counts of Hunt's Complaint.

is the allegation that "[t]he kickback and/or bribery scheme between Cochise, Wayne Shaw, and Parsons" violated the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51 *et seq*., which in turn "resulted in Parsons billing the Government for tainted and illegal services" in violation of the FCA. Doc. 118 at 36.

In his opposition briefs, Hunt expressly states that he is no longer "pursuing the kickback and/or bribery claims contained in Counts I and Count II." (Docs. 230 at 10; 234 at 37). Because the Defendants' alleged violations of the Anti-Kickback Act are the sole basis for Count I,[4] the Court will grant summary judgment in their favor.

### C.    Parsons is entitled to summary judgment on Count III.

The Court now turns to Count III, which Hunt brings only against Parsons.[5] Hunt seemingly alleges[6] that Parsons violated § 3729(a)(1)(B) of the False Claims Act, which makes liable anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

Hunt says that Parsons violated this subsection of the FCA when it used two false documents to justify awarding the subcontract to Cochise: (1) the Limited

---

[4] Hunt also mentions 48 C.F.R. § 6.101 and 41 U.S.C. § 3301 in passing but does not explain how rules that apply exclusively to the federal government also apply to Cochise, a contractor. Nor does Hunt explain how Cochise violated either rule or regulation without a bribe or kickback.

[5] Because Hunt's FCA conspiracy claim in Count II requires consideration of Counts I, III, IV, and V, the Court will address that claim last.

[6] Hunt's amended complaint contains numerous incorrect or inexistent citations. In Count III, Hunt alleges a violation of "§3729 (a)(2) of the False Claims Act," which deals with reduced damages. (Doc. 118 at 42). However, because Hunt goes on to quote the language of § 3729(a)(1)(B), the Court construes Count III as a claim under that subsection.

Notice to Proceed, and (2) SSA Hill's interoffice correspondence "stating that" the unusual and compelling urgency justification in "48 C.F.R §6.302-2(b) was applicable and therefore precluded Parsons' obligation to engage in full and open competition." Doc. 118 at 42.

The FCA requires that the "false record or statement" be "material to a false or fraudulent claim." § 3729(a)(1)(B). A few doors down, the FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." § 3729(b)(4). Further, the FCA requires proof of "an objective falsity." *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1298 (11th Cir. 2019).

In any event, this Court need not address whether Parsons' justifications were objectively false, because neither document is material. Unless Defendants have a time machine, neither document could have influenced "the payment or receipt of money," § 3729(b)(4), because both documents were prepared after Cochise was chosen as the subcontractor. Even taking Hunt at his word that Parsons and Cochise somehow manipulated USACE, it's clear from USACE CO Jones' email that Cochise was chosen on February 17, 2006. Doc. 221-4 ("To expedite the requirement . . . Parsons will sole-source this to Cochise (based on urgency) to meet mission deadlines."). Parsons and Cochise entered a BOA and Cochise signed the contract on

February 18, 2006. Docs. 221-15 at 2; 221-73 at 17.  But the LNTP and

interoffice memo were not issued until February 20 and 21, respectively.

Docs. 221-16 at 2, 6. Not only that, but as Defendants correctly point out,

"there is no evidence that anyone from the Government ever saw the LNTP

or Interoffice Correspondence," Doc. 220 at 30, which Hunt does not rebut.

Instead, Hunt responds that after the "original LNTP expired" on March

8,

> Cochise continued to work on the subcontract until the contract
> ended on September 30, 2006 without an "unusual and
> compelling urgency" determination and without any submission
> to open and fair competitive bidding. Thus, even if the Court
> determines that the initial email containing the LNTP was not
> objectively false – which it was –the Court must accept the
> undisputed fact that the LNTP expired 15 days after it was issued.
> Subsequently, no additional LNTP was issued, and no open and
> fair competitive bidding took place."

Doc. 234 at 42.

But that argument falls flat. Why? Because the LNTP was not a separate

subcontract but a placeholder agreement that spanned the gap between

Parsons' acceptance of Cochise's bid and finalization of the parties'

subcontract. That much is clear from the terms of the LNTP itself, which

"authorize[d] Cochise[] to proceed with the subject work effort in advance of

execution of a definitized contract." Doc. 221-16 at 2.

18

The LNTP ended on March 8, 2006, *id.*, and the subcontract appears to have been fully executed no later than February 27, 2006—Cochise CEO Jesse Johnson signed the subcontract on February 18, 2006, Doc. 221-73 at 17, and Cochise' vouchers show a contract date of February 27, 2006. *See, e.g.*, Doc. 233-6. No wonder, then, that Parsons didn't issue another LNTP, because the "execution of a definitized contract" took place well before the LNTP expired. From then until Cochise rolled off the contract six months later, the relationship was governed by the subcontract, not the LNTP.

Hunt points to no other facts in the record to support his allegations on this count, and "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *U.S. ex rel., Kaimowitz v. Ansley*, 250 F. App'x 912, 914 (11th Cir. 2007). For these reasons, the Court **WILL GRANT** summary judgment in Parsons' favor on Count III.

### D.    Defendants are entitled to summary judgment as a matter of law on Count IV.

The Court next turns to Count IV. After removing the bribery and kickback allegations from the equation, Count IV of the FAC alleges that Defendants committed a "false certification" FCA violation. (Docs. 118 at 44-45; 234 at 12). The FCA makes liable anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or

causes to be made or used, a false record or statement material to a false or fraudulent claim." § 3729(a)(1)(A)-(B).

False certification liability comes in two varieties, express and implied. Express false certification occurs when an entity "certif[ies] that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds." *United States v. Crumb*, 2016 WL 4480690, at *13 (S.D. Ala.) (citation omitted). Implied false certification, on the other hand, exists "at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 190 (2016).

Hunt's new false certification theory goes like this: First, Cochise worked beyond the allotted contract period provided in the Limited Notice to Proceed. Under this theory, the LNTP expired on March 8, 2006, and because "[n]o bidding at all took place after the" LNTP expired, Cochise worked "from March 9, 2006, until approximately September 30, 2006 . . . on a no-bid/sole source basis." Doc. 230 at 14. During that time, Cochise submitted requests for payment which certified that the request was "correct and proper for payment." *Id.* at 13 (referencing Standard

Form 1034, "Public Voucher for Purchases and Services Other than Personal"). As a result, the "correct and proper" certification submitted on each Form 1034 was false because Cochise's "perform[ance of] no-bid/sole source work violated the Contracting Act (CICA) of 1984, 41 U.S.C. § 253; Federal Acquisition Regulation (FAR) clause 52.244-5, Competition in Subcontracting (Dec. 1996) and Contract No. W912DY-04-D-0005 executed between Defendant Parsons and the USACE." *Id.* at 14.

Defendants argue that they are entitled to summary judgment on Count IV because Hunt's amended complaint contains no specific factual allegations to support his claim, let alone any mention of Form 1034. Defendants also argue that even if Form 1034 is admissible, Hunt's evidence doesn't support his false certification claim. The Court agrees.

### 1) *Hunt's new false certification arguments cannot be raised for the first time in opposition to summary judgment.*

First, Hunt has abandoned his kickback claims, leaving only false certification as the basis for Count IV. But Hunt's opposition to summary judgment is the first time this Court has heard that Cochise' performance of "no bid/sole source work" on the LNTP "violated the Contracting Act (CICA) of 1984, 41 U.S.C. § 253; Federal Acquisition Regulation (FAR) clause 52.244-5, Competition in Subcontracting (Dec. 1996) and Contract No. W912DY-04-D-0005 executed between Defendant Parsons and the USACE." Doc. 230 at 14, or that Parsons'

"certifications that Cochise's services were proper for payment [were] false and fraudulent because Parsons knowingly failed to engage in competitive bidding" as required by the prime contract and federal law. Doc. 234 at 32.

Hunt's complaint never mentions Standard Form 1034. *See* Doc. 118. Instead, the Complaint alleges only that "Defendants had an affirmative legal obligation to engage in full and open competition," Doc. 118 at 32, and that "[w]ith each invoice and/or billing statement submitted by Parsons to the Government, Parsons expressly and/or implicitly certified to the Government that it (Parsons) had engaged in full and open competition as required by applicable federal laws concerning Subcontract No. 800618-60006 and Parsons' Task Order 74475730003; the subcontract awarded to Cochise." *Id.* at 45.

But Hunt cannot dodge summary judgment by "amend[ing] his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment." *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) (quoting *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1314-15 (11th Cir. 2004)). Since Hunt has abandoned his Anti-Kickback Act claim—the only applicable federal law cited in his Complaint on this point—these "allegations are so vague and ambiguous that in order to determine whether they state a cause of action," the Court "would have to assume" essential facts like which other federal laws were "applicable" to the contract. *Id.* Those are gaps the Court

cannot fill on its own, and Hunt's "failure to make those allegations in [his] amended complaint precludes [him] from recovering on that basis." *Cobblestone Glen Flats, LLC v. R&R-Beth LP*, 2022 WL 97050, at *4 (N.D. Ala.).[7]

### 2) *There is no evidence of a false certification by Defendants.*

Even if the Court could consider Hunt's new false certification argument, Defendants would still be entitled to summary judgment because Standard Form 1034 does not support Hunt's allegations. In fact, Hunt's description of the document is wrong.

First, Hunt says "Parsons expressly and/or implicitly certifie[d] that" the vouchers were "correct and proper for payment." Doc. 234 at 22. But Cochise CEO Jesse Johnson, not Parsons or its representatives, signed the SF 1034 vouchers, as seen below.

---

[7] Because the Court finds that Hunt's false certification claim is unsupported by evidence, it need not address whether that claim passes muster under either express or implied false certification theories. However, even if Cochise or Parsons *had* signed Form 1034's "correct and proper" certification, Hunt's claim would still fail. First, "the existence of allegedly anticompetitive activity surrounding the subcontract bidding processes does not translate into the existence of legally false claims." *United States ex rel. Barko v. Halliburton Co.*, 241 F. Supp. 3d 37, 58 (D.D.C.), *aff'd*, 709 F. App'x 23 (D.C. Cir. 2017).

More importantly, Form 1034's "correct and proper" certification "does not contain any certifications to the government regarding the bidding process or compliance with any law, regulation, or contract." *Halliburton Co.*, 241 F. Supp. 3d at 58. As a matter of law, a "correct and proper" certification does not "certif[y] that the amount invoiced was reasonable because the subcontract was competitively bid, or even that it was in compliance with the terms of the . . . contract or relevant regulations." *Id.*; *see U.S. ex rel. Thomas v. Black & Veatch Special Projects Corp.*, 2013 WL 3878168, at *3 (D. Kan.) (holding that Form 1034's correct and proper "certifications relate to the propriety of the fiscal data and reports submitted to the government[, not] compliance with all material terms of the contract.").

| NUMBER AND DATE OF | DATE OF DELIVERY OR SERVICE | ARTICLES OR SERVICES (Enter description, item number of contract of Federal supply schedule, and other information c | USA Cost Codes | | | AMOUNT | |
|---|---|---|---|---|---|---|---|
| | | See Detail Following Task | | | | | |
| | 06/01/06 | 1    Mobilization/Demobilization | | | | $ | - |
| | 06/30/06 | 2    Camp Victory-Project Management | | | | $ | 1,291,683.85 |
| | | | | | | $ | - |
| | | | | | | $ | - |
| | | | | | | $ | - |
| (Use continuation sheet(s) if necessary) | | | | | TOTAL | $ | 1,291,683.85 |

PAYMENT: [X] PROVISION

[ ] COMPLETE

[ ] PARTIAL

[ ] FINAL

[ ] PROGRESS

[ ] ADVANCE

I certify that these costs have not been previously invoiced and are true and accurate to the best of my knowledge.

Subcontractor

*Jesse L. Johnson*    01 Juh 06

Jesse L. Johnson                    Date

TITLE: President & CEO

DIFFERENCES

AMOUNT VERIFIED: CORRECT FOR

(Signature or initials)

Pursuant to authority vested in me, I certify that this voucher is correct and proper for payment.

(Date)        (Authorized Certifying Personnel)        (Title)

Doc. 233-6.

Second, the "correct and proper for payment certification" was made by another party—Parsons asserts that the USACE's "Authorized Certifying Personnel" was responsible for signing that certification, which Hunt does not dispute. Doc. 246 at 19. Regardless, Cochise only certified that the invoiced "costs have not been previously invoiced and are true and accurate." *See, e.g.*, Doc. 233-6. But Hunt has not alleged that Cochise's cost certification was false or submitted evidence to support such an allegation. As a result, no reasonable jury could conclude that Form 1034 was a false certification by either Cochise or Parsons, and the Court **WILL GRANT** summary judgment in Defendants' favor on Count IV.

### E.    Defendants are entitled to summary judgment as a matter of law on Count V.

Count V contains a "reverse false claim" under the FCA, which "creates liability for conduct that results in no payment to the government when a payment is obligated." *United States ex rel. Wallace v. Exactech, Inc.*, 2020 WL 4500493, at *20 (N.D. Ala.) (cleaned up).

The FCA makes liable anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The FCA defines an "obligation" as "an established duty . . . arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

According to Hunt, Defendants "knowingly made, used, or caused to be made or used false records and statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government," which is a restatement of the statute, not an allegation. Doc. 118 at 45. Hunt continues that because of Defendants' "false or fraudulent and illegal actions and pattern of fraudulent conduct," the United

States is "entitled to a refund for overpayment . . . up to the full amount it has paid to the Defendants on such fraudulent claims, plus treble damages." *Id.*

There are two problems with Hunt's theory of liability. First, "Hunt does not identify the source of any statutory or regulatory scheme that required the Defendants" to repay the government. *U.S. ex rel. Potra v. Jacobson Companies, Inc.*, 2014 WL 1275501, at *3 (N.D. Ga.). Such "conclusory assertions . . . are insufficient to demonstrate that an obligation arose from some independent legal duty owed to the Government." *Id.* (quotation marks omitted).

More importantly, Hunt's reverse false claim allegation fails because § 3729(a)(1)(G), enacted in 2009, does not apply retroactively to the conduct here, which took place in 2006. Because Federal courts function under an "operative presumption…that Congress intends its laws to govern prospectively only," *Vartelas v. Holder*, 566 U.S. 257, 273 (2012), "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208 (1988).

Nothing overcomes that operative presumption here. Cochise submitted its last invoice on October 9, 2006, Doc. 216-20 at 38, but "the 2009 amendments to the FCA generally apply only to conduct on or after May 20, 2009," except for § 3729(a)(1)(B), which "applies retroactively to all claims pending on or after June 7, 2008." Fraud Enforcement And Recovery Act Of 2009 (FERA), PL 111-21, §

4(f)(1), 123 Stat. 1617, 1625 (2009); *see U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 (5th Cir. 2010).

To be sure, Congress expressly provided for the retroactive application of two other subsections when it amended the FCA in 2009. But that cuts in Defendants' favor, not Hunt's—"[w]hen Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning." *Bittner v. United States*, 598 U.S. 85, 94 (2023). As a result, "the plain language of [§ 3729(a)(1)(G)] evidences clear congressional intent that [the provision] is not applicable" to conduct "before its effective date." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 838 (1990). Thus, the Court **WILL GRANT** summary judgment in Defendants' favor on Count V.

## F.    Defendants are entitled to summary judgment as a matter of law on Count II.

In Count II, Hunt alleges that Cochise and Parsons violated the FCA's conspiracy provision, which makes liable any person who conspires to violate any of § 3729(a)(1)'s six other subsections. 31 U.S.C. § 3729(a)(1)(C). To state a conspiracy claim under the FCA, a relator must allege: "(1) an unlawful agreement between defendants to commit a violation of [the FCA]; (2) an act performed in furtherance of the conspiracy; and (3) that the United States suffered damages as a result." *United States v. HPC Healthcare, Inc.*, 723 Fed. Appx. 783, 791 (11th Cir.

2018). Here, Hunt's claim fails because the undisputed evidence does not show that Defendants violated any other FCA provisions.

Defendants argue that they are entitled to summary judgment because Hunt's conspiracy claim amounts to a mere allegation that the defendants conspired with each other, which is insufficient to state an FCA claim, and that Hunt has no other evidence of conspiracy or wrongdoing without his bribery and kickback allegations.

Hunt counters that § 3729(a)(1)(C) prohibits conspiracy to violate *any* of § 3729(a)(1)'s provisions, not just bribery and kickbacks. Thus, Hunt instead asserts a "false certification" conspiracy. Hunt says that the Defendants conspired, "as alleged in ¶ 133 of the Amended Complaint, 'to rig the full and open competition process and/or competitive bidding process in order to make a sole source award' of the Subcontract" to Cochise. Doc. 234 at 37. The Complaint claims that Defendants conspired to violate "31 U.S.C. §§ 3729(a)(1), (a)(2), and (a)(7); and/or violate 31 U.S.C. §§ 3729, §§ 3729(a)(1)(A) (B), and (G) in contravention of the False Claims Act, 31 U.S.C. §3729(a)(3), and/or 31 U.S.C. §3729(a)(1)(C)." *Id.*

But Hunt's FCA conspiracy claims don't hold water, because "[s]econdary liability for conspiracy to violate the FCA cannot exist without a viable underlying claim," and Hunt's amended complaint does not contain a viable underlying claim, on false certification grounds or otherwise. *United States ex rel. Marsteller v. Tilton*,

556 F. Supp. 3d 1291, 1317 (N.D. Ala.) (cleaned up). Consider Hunt's list of alleged

FCA violations, one by one:

➤    Defendants cannot have violated § 3729(a)(1), because it's only the umbrella clause for the FCA violations detailed in subsections (a)(1)(A)-(G).

➤    Defendants cannot have violated § 3729(a)(2), because it does not create liability, but only provides the requirements for reduced damages.

➤    Defendants cannot have violated § 3729(a)(7), because it doesn't exist.

➤    Defendants cannot have violated § 3729(a)(1)(A), which makes liable "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." That's because Hunt abandoned his claim under this provision in Count I, and his false certification claims in Count IV fail for the reasons discussed above. *See supra* Part III.D.

➤    Defendants cannot have violated § 3729(a)(1)(B), which makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Again, this provision cannot support a conspiracy claim because Hunt's false certification claims fail. *See supra* Part III.D.

➤    Defendants cannot have violated § 3729(a)(1)(G), which is the FCA's reverse false claim provision, because it does not apply retroactively to Defendants' conduct. *See supra* Part III.E.

➤    Defendants cannot have violated § 3729(a)(3), because it only prescribes liability for the cost of civil actions under the FCA.

As a last gasp, Hunt says the Court should let his conspiracy claims go to trial,

because "civil conspiracy allegations are not generally suited to determination on

summary judgment." Doc. 230 at 15. Even so, Rule 56 is not a panacea for unsupported civil conspiracy allegations—the Eleventh Circuit has "consistently held that conclusory allegations," even civil conspiracy allegations, "without specific supporting facts have no probative value, and are legally insufficient to defeat summary judgment." *Sun v. Girardot*, 237 F. App'x 415, 417 (11th Cir. 2007) (affirming summary judgment on § 1983 conspiracy claim).

That's enough to doom Hunt's conspiracy claim. Even if Hunt had provided some evidence of a secondary FCA violation, Defendants have denied participation in or existence of a conspiracy. *See, e.g.*, Doc. 221-51 at 3 (Dep. of Wayne Shaw); Doc. 221-27 at 21-22 (Dep. of Steve Scales); Doc. 221-14 at 15 (Dep. of Steve Hamilton). But Hunt has offered no evidence contradicting "Defendants' evidence [denying] any conspiratorial relationship," let alone "plead in detail the nature of the alleged relationship or agreement between Defendants" outside of his abandoned bribery and kickback claims. *Sun*, 237 F. App'x at 417. As a result, the Court will grant summary judgment in Defendants' favor on Count II.

## IV.    Conclusion

For all these reasons, the Court **FINDS** that there is no dispute of material fact, and **GRANTS** summary judgment for Defendants as a matter of law.

The following motions are also pending before the Court:

➢    Hunt's Amended Motion for Hearing or Pretrial Conference, Doc. 275;

- ➢ Parsons' Motion to for leave to file an amended answer, Doc. 273;
- ➢ Hunt's Motion for leave for non-party witnesses to appear remotely at trial, Doc. 268;
- ➢ Hunt's Motion for a Rule 16(c)(2)(G) pretrial conference, Doc. 257;
- ➢ Parsons' Motion to limit the testimony of Robert Linsmier, Doc. 219;
- ➢ Parsons' Motion to limit the testimony of Gordon Jones, Doc. 218;
- ➢ Parsons' Motion to limit the testimony of Stuart Bowen, Doc. 217;
- ➢ Hunt's Motion in Limine to Exclude Defendant Expert Christopher Mlinarchik's Testimony, Doc. 215; and
- ➢ Hunt's Motion to Exclude Testimony of Parsons Expert Mary Karen Wills, Doc. 214.

Because the Court has granted summary judgment for the Defendants, these pending motions are **DENIED AS MOOT**.

A separate final judgment will be issued, and the Clerk is **ORDERED** to close the case. Fed. R. Civ. P. 58. Costs are taxed as paid.

**DONE** and **ORDERED** this March 19, 2025.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE